Next case is Jordan B. Walker.  My name is Mike Donahue. I am appointed counsel for Mr. Mr Jordan, the plaintiff appellant in this case. There are two hours in the district court below first at the screening stage under section 19 50 A. Where the district court dismissed his handcuffing claim reasoning that the only reason. Brian, the only reason that Mr Jordan's claim couldn't go past to the service stage was that the handcuffing itself wasn't a serious enough injury. That was a too simplistic version of the test that this course applies in the case of handcuffing. Where you balance the necessity of the force used against the amount of pain that it caused. So that was the first order that we're discussing today. The second being the district court's grant of summary judgment on the conditions of confinement claim. Choosing to disregard Mr Jordan's sworn testimony as to the conditions of his cell. That it was too cold, that it was freezing, that he didn't have enough protection from that cold. That there was human waste and other fluids within the cell. Perhaps you could help me a little bit on the first one that you talked about, the cuffing. It seems to me that in an excessive force claim like this, you've got two questions. One is the question of the amount of the force and whether it was reasonable or not. The second is, was there so-called malice? And that's when you're dealing with excessive force within the confines of the Bureau of Prisons or the Bureau of Corrections. Which is different from excessive force in connection with an arrest. You're looking at malice. And it's possible, so then I'm focusing on the relationship between the force used and whether there was malice in effect. It was malicious or sadistic. And here I don't think the district court addressed that last point. I think the district court found, correct me if I'm wrong, that the force was in effect de minimis or not terribly injurious. But didn't address whether the officers acted with malice or not. Or were they just fairly applying what they thought was the appropriate force to deal with the problem at hand. That's right, Your Honor. And that's why I say the analysis was too limited below. And Mr. Jordan adequately alleged that that malice was there. Yeah. And now if you have a non-excessive use of force, it's still a use of force. But it's not, doesn't, you know, objectively it doesn't seem like very much. You could still have malice in the use of any force. Right? Because maybe the person didn't deserve any force. Or it could be very slight. But it could be directed at this guy, you know, out of ten people who are in the same situation. The officers decided to go after your client rather than the other nine. Because they don't like him. That's right, Your Honor. The constitutional test here is whether there's a good reason for the force. Whether the necessity of the force is balanced with the force used. And the maliciousness kind of folds into that. If there was no reason for the force, it's by definition malicious and wanton.  If there's no reason. But there might be some reason. And then the question is what about if there's minimal force that's used to correct a problem. But the police just also don't like the guy. Where do we stand on that? It's sort of a dual motivation. I think that would be a more, it would be still focused on this idea of, and in Davidson, the question is in access of what was necessary under the circumstances. And I think that's the key test here. And even if, and that's not the case here. But even if there was a malicious purpose but the force used was appropriate, that wouldn't necessarily be unconstitutional. So here, I'm sorry. No, go ahead. There are allegations in the complaint of threat of use of force before the initial restraints. And then allegations again by the client that he didn't, he stopped, he didn't respond to questions regarding self-harm. Don't those allegations undermine any ability to meet the subjective problem? Recognizing it's not how the district court concluded, but we would have to make that determination in the alternative, potentially. And I think, Judge Nathan, to answer that question, it's important to keep in mind the context of this order. This was on a 1958 screening, well before service was issued, and then there was no opportunity to amend. And even in that posture, the district court- Can't amend away claims, allegations that were made, right? You can't just delete the allegations that I threatened to use force and that I was non-responsive to a self-harm inquiry in order to be able to survive a motion to dismiss, can you? You can't, Your Honor. So what would you plead here if you were given the opportunity to re-plead that would make out the subjective problem at this stage? So, just as a note, my appointment is limited to the appellate level, but below, Mr. Jordan would have the opportunity to explain more about the pain that was caused, or the extent to which the restraints were harming him, simply because he made a threat well before the restraints were applied too tightly. That is, for the five hours that he was kept within his cell in solitary. For the district court to find that that makes the force use appropriate is drawing an inference against Mr. Jordan. At that point, there's a question of whether keeping him confined in his cell, tethered, the black box, alone, whether that's sufficient to respond to a threat that he made while anxious and uncertain about what his future was going to be. And two, it's drawing an inference against the fact that he didn't resist at all. According to the allegations, there's no indication that he struggled against the handcuffs. There's no indication that he started speaking afterwards. And so the district court, by choosing to essentially credit what I imagine that the state would argue, that he made threats and that the force was against the threats, that's against the standard that he should have been applying in the 1915-A context. Focusing on the second part of this appeal, which is, and I see my time is almost done, I'll just say that there's really no dispute about a lot of the facts here. It was cold. It was freezing. The court took traditional notice of the fact that it was 30 degrees outside. And there's no dispute that there was cold air blowing within the cell at the time of his incarceration for two weeks. And so it's very clear that when you have these allegations of waste and you have allegations of cold, freezing cold, that the blankets and clothes aren't enough to combat, that that lays out an Eighth Amendment claim. Would the allegations of cold be sufficient by themselves? I think so, Your Honor. I don't have a holding case, but the Wilson case for the Supreme Court observed that allegations that it's cold and you also don't have enough linens to protect against that cold could lay out an Eighth Amendment claim. Now, that was just an observation. But I think it indicates here that when being left in the cold without the ability to protect yourself is against the minimal level of society's dignities that the Eighth Amendment is supposed to protect. How are we supposed to think about the video evidence with regard to, I realize that it doesn't illuminate the coldness aspect of this Eighth Amendment claim, but it seems to contradict a good number of your client's allegations, statements about the conditions in the cell. And I think in that case, Your Honor, the video evidence is actually quite limited. This is from, it's a video taken from outside the cell. You can't smell anything from video. You're not living in the cell for two weeks without video. And so in that essence, I don't think it's a direct contradiction of Mr. Jordan's sworn testimony. He was saying more than it just smelled bad. He was pointing to specific visible condition of conditions that he felt were inappropriate. And those were refuted by the video. Your Honor, to an extent they were. The video didn't cover the entirety. And, you know, for example, forgive me, but say that there was urine. It may be visible. It may not be visible on the ground. It may be dried. But it will still smell. And, you know, I note that in the Wiley case, one thing it focused on was the grotesquery of the odor. And so we have here this indication that when you can feel the presence of that waste, that that itself moves you towards the Eighth Amendment claim. I thought there was evidence here that he was given materials with which to clean the cell. Maybe they didn't have a maid come in to do it. But he could have. He was an inmate, and he was in a position to clean his cell. Correct me if I'm wrong on that. Well, the record shows that Mr. Jordan, according to Mr. Jordan's testimony, he, and this is page 258 of the record, he requested that when he first moved in, and it was denied. And he moved into the cell. He was placed in the cell on a Wednesday, and cleaning supplies were only distributed on a Sunday. And so he didn't have the opportunity for at least those four days to do the cleaning necessary to make his cell livable. Thank you. May it please the Court. Evan O'Rourke, Assistant Solicitor General, on behalf of Warden Walker and Captain Watson. This court should affirm the district court which properly dismissed the excessive force claim and granted summary judgment on the conditions of confinement claim. I'd like to begin with the excessive force claim and respond to some of the discussion about the subjective prong. There are two key points here on the subjective prong, which is the concessions that the plaintiff made in his allegations, which is that he made threats. There was a clear disciplinary purpose for the actions that the correctional officers took in applying the install restraints. But equally important, secondly, is the absence of any claim of wanton or malicious intent on the part of the correctional officers who applied the restraints. There were some vague allegations or references to fear of retaliation in the initial complaint, which is on Joint Appendix 17 and 20. But the references to retaliation were about fear of returning to the general population and being placed in a cell with another inmate who might harm him at the direction of correctional officers. There was no reference at all in the complaint to any notion that the officers who were applying the in-cell restraints were overly tightening them for the very purposes of harming him and retaliating against him. So for that reason, this court— Well, separate those two. For the purpose of harming, the purpose is retaliation. I understand your point as to retaliation. There's no allegations that these officers had a basis to retaliate. But for the basis of harming him, if the allegations are that it was excessive force unnecessarily applied because I wasn't reacting and I was held restrained for a long time in the absence of any continuing threat, would that allow an inference at the pleading stage as to doing it for the purpose of harm? It could if there were facts alleged that the officers knew or should have known that the handcuffs were too tight. For instance, there's plenty of cases, both parties cite, in which a plaintiff asked for the cuffs to be loosened and correctional officers or police officers rejected those requests or even without— it's not required to verbally request loosening, but even express pain or discomfort. And here we have the exact opposite. Lieutenant Gray in his report noted that at no point did the plaintiff show any signs of discomfort throughout this process. So here, I don't think there's any facts in the complaint that could support that type of inference. The second point I wanted to make with respect to the excessive force claim is just the amendment and the request to amend or replead. The plaintiff here had an opportunity to amend. The charge—I'm sorry, the claims that were dismissed at the initial review order were dismissed without any indication that they were with prejudice or without prejudice. So this appears on page 83 of the joint appendix. It just says dismissed. And the cases that plaintiff relies on, specifically Abbas and Collymore, those are cases in which the district court dismissed with prejudice or without leave to amend. And it's not apparent on the face of the decision in Abbas, but if you dig back through the history of that case, the magistrate judge's decision from three years earlier explains that the initial review order dismissed the claims with prejudice. So here it was just a dismissal, and the court didn't say one way or another whether it was with prejudice or without prejudice. So the plaintiff could have sought leave to amend at any point from the time of the initial review order to the time summary judgment entered. And so really, in order for this court to hold that there was an abuse of discretion, it would have to say that it was an abuse of discretion for the district court to not expressly invite repleting. And I don't believe there's any authority to support that type of a claim. If there's no further questions on the excessive force claim, I'll touch just briefly on the conditions of confinement claim. The video evidence here directly contradicts the plaintiff's claims of a filthy cell. And I think the key point here is the breadth of the plaintiff's claim. Had plaintiff been more particular or precise or specific in explaining where the filth was located, arguably the video evidence might not be dispositive. But here the plaintiff alleged in his initial complaint that the entire cell, the bunks, the floors, the beds, the walls, the sink, the toilet were covered in human waste. So what to do if it refutes some portion of the allegations but not others? So it doesn't refute cold. The counsel points out arguably it doesn't refute the existence of urine. It doesn't refute the existence of, I think it was pepper spray residue of some kind. But let's say I agree with you that it does certainly refute the existence of being covered in feces. What to do then? So we agree. We're not relying on the video evidence for the conditions that arguably would not be visible. So we address only the pepper spray residue and also the dust, rust, and mold to the extent there were, he was alleging he was inhaling it. And then also the cold. On all of those where our position is that the claims on their face do not rise to the level of a constitutional violation because they're not objectively, they did not, under the objective prong, did not pose an unreasonable risk of serious damage to his health. And I'm happy to go through each of those. But so for instance, with respect to the pepper spray residue. We say to Pascal Barrow's case, which explains that in this circuit, the temporary discomfort and stinging sensation from pepper spray generally is not objectively sufficient or serious enough to satisfy that prong under the Eighth Amendment. And especially when decontamination is available or water is available to wash it off, as was the case here. So on its face, the pepper spray residue claim fails. With respect to the ventilation or dust, rust, or mold exposure, there's no allegation that he was harmed by it or that those conditions posed an unreasonable risk of harm to his health. And then likewise, with respect to the cold, which obviously is not visible on the camera, although the correctional officers, we noted about half of them were wearing short sleeves, which undermines the idea that it was severely cold in there. But on its face, the... At least it wasn't cold where they were spending time. True. Yes. And we recognize the limits to that point. But on its face, the parties agree that the plaintiff spent 14 days in the cell. And unlike in the cases in which this court has allowed these types of cold temperature claims to proceed, there's no allegation of direct exposure to the outdoor winter elements, and there's no allegations of any physical effects of the cold temperature in the cell, whether it be water freezing in the cell, ice forming in the cell, or causing some sort of illness to happen or some other physical ailment. All we have here is just a generic allegation that it was very cold in the plaintiff's opinion. He was given some more protection after the first night. That's correct. Once he was removed from behavioral observation status, he was provided with the normal attire for an inmate. But presumably, it was the same attire and the same covering, bedding, and so forth, that he would have gotten if it hadn't been cold. So here we're trying to figure out, well, how cold was it? Is this enough or not? You know, that's – how do we decide this? Right. So each of these – there's a spectrum, right, between something that's clearly severe enough and long enough in duration to rise to the level of violating the Eighth Amendment. And then there's claims that clearly don't meet that level that are just vague allegations of I was uncomfortable. We believe that the facts here fall far closer to the latter category of cases than the former. Well, I understand that. But did he complain after he got the bedding on the second day? For the next two weeks, was he complaining every day? I think there's the – yes, insofar as he filed grievances and formal inmate requests. And they felt that they had done enough, I guess. I mean, obviously. I think that on that point, there's a – with respect to – I think that would fall under the subjective prong, right, whether or not they were deliberately indifferent. We don't rely on that. I think that there would be a material dispute of fact. But we believe that the district court properly concluded there's no material dispute of fact as to the objective element. If there's no further questions, we would ask this court to affirm the judgment of the district court. I'd like to take a few moments to focus on the pepper spray portion of things. So there's no indication that pepper spray would be visible on the videotape. And on the idea of it being able to be cleaned, remember, there were four days he was in the cell when not able to clean that pepper spray. And the idea that he could take just the water from his sink and put it on his bed, wetting his bed in freezing temperatures, further shows that the conditions of the cell were violating the Eighth Amendment. And so, too, with his request of Captain Watson for long johns and a sweatshirt, altogether creates this record that this was too cold to live in, that it was not hygienic enough to live in. And he complained about that rather quickly. And that creates the objective portion of the Eighth Amendment claim. Thank you. Thank you. Thank you both. And thank you, Mr. Donahue, for your assistance to the court. Well argued.